FLORENCE H. OLSON v. C. L. MULLEN AND ANOTHER.[1]

February 18, 1955.

No. 36,411.

[1]Reported in 68 N. W. (2d) 640.

*Edward Cohen,* for appellant.
*Frank J. Collins,* for respondents.

KNUTSON, JUSTICE.

For a determination of this appeal the essential facts may be stated as follows:

On March 28, 1925, one Percy F. Kearney was the owner of lots 1 and 2 of block 2, Wooddale Heights in Hennepin county. In order to more easily understand the facts stated herein, it may be assumed that these lots run in an easterly and westerly direction, lot 1 lying immediately to the north of lot 2. The lots are bounded on the east

by Oakdale avenue. There is no alley on the west side of lot 2. Lot 1 is bounded on the north by Morningside Road.

On March 28, 1925, Kearney conveyed lot 2 to one Adolph F. Olson, who purchased the lot for the purpose of building a house thereon. Sometime during the year 1928, Olson completed building his house, and about two or three years later he built a garage on the northwest corner of his lot. About the same time, he built a concrete driveway about 7.75 feet wide running from Oakdale avenue to his garage, the north side of which was on the line between the two lots. The house was built about 9.4 feet from the north line of lot 2 and faces Oakdale avenue. On October 23, 1936, Adolph F. Olson conveyed the property to plaintiff's husband, and on June 24, 1939, she became the owner thereof through a conduit.

In 1937 a house was erected on lot 1 by a predecessor in title of defendants. Defendants acquired lot 1 and began occupying it in 1940. Defendants' home faces Morningside Road.

There is a natural slope of these two lots to the north, plaintiff's lot being considerably higher than defendants'. At the time Adolph F. Olson purchased lot 2 there was a rather steep hill or grade which dropped abruptly to the north from approximately the north line of lot 2. This hill or grade varied in depth, being one to two feet toward the east end of the lot, eight to ten feet in approximately the center of the lot, and less again at the rear end of the lot. Some of the witnesses stated that the descent was at an angle of about 45 degrees. Neither Adolph F. Olson nor his predecessor changed this slope, and the house was built by Olson on the lot as he found it.

As a result of the steep slope of the land, water drained off plaintiff's property onto that of defendants, causing gullies or washouts to occur in the bank, and water frequently would flow into the window wells on the south side of defendants' house and into the basement and recreation room. The steep slope caused a serious drainage problem for defendants, and shortly after they moved into their house they began to try to alleviate this problem by diverting the water away from their house. At first their efforts were limited to removal of part of the bank by hand, but in 1950 to 1952 more

extensive excavations were done, and they ultimately obtained a bulldozer which cut the bank down almost perpendicular on the line between the lots for a depth of from five to six feet to the natural level of the land. They then left a ledge about two to three feet wide to support the soil in plaintiff's lot at its natural level, and then excavated to a depth of about three feet below the natural level of the land. When they first started to dig, they ascertained that the top five or six feet of the bank consisted of an artificial fill in which they found scraps of plaster, cement, tin cans, metal lath, and other material normally not present in the soil in its natural condition. The result of this excavating has been to eliminate defendants' drainage problem, but the soil in the bank now has eroded to such an extent as to undermine plaintiff's driveway and render it unsafe for use.

Plaintiff commenced this action for a permanent injunction to restrain defendants from maintaining this excavation in such manner as to remove the support for plaintiff's property. The appeal is from a judgment entered in favor of defendants.

■ There is no motion for a new trial, so we are limited to a consideration of whether the evidence sustains the findings of fact and whether such findings sustain the conclusions of law and the judgment. Potvin v. Potvin, 177 Minn. 53, 224 N. W. 461; Hickman v. Sutherland, 222 Minn. 161, 23 N. W. (2d) 593.

Only one finding of fact is in any way challenged or raised by the assignments. With respect to the nature of the hill on plaintiff's lot, the court found:

"That the bank or hill above described, both that on Lot 2 and that on Lot 1, above a line about three feet up from the grade on which defendants' house is built on Lot 1, at a point near the center of plaintiff's house on Lot 2, and tapering off to a lower level at both ends of Lot 2, is all 'fill' earth, as ordinarily described, or composed of earth or other substances placed there by human hands and not by the action of nature. That the undisputed evidence further shows that all of such 'fill' was in place for over twenty-five years and was placed there before either of the parties herein had any inter-

est in the lots and before plaintiff's predecessor in interest bought Lot 2 and probably while both lots were under common ownership, although the exact date it was placed there has not been shown."

Plaintiff contends that there is no evidence to sustain the court's finding that the hill or grade here involved is artificial fill. It would be useless to set forth in detail the evidence supporting the court's finding in this respect. It is enough to say that, under well-established rules which govern our review of questions of fact on appeal, the evidence is more than ample to sustain the court's finding.

Fundamentally, the appeal presents two questions of law, namely:

(1) Is plaintiff entitled to support of her land under the doctrine of lateral support?

(2) If not, does she have an easement by implication giving her the right to such support?

■■■ The rules respecting the right to lateral support are well established in this state. Most of the questions involved here on this issue have been answered in Sime v. Jensen, 213 Minn. 476, 479, 7 N. W. (2d) 325, 327, where we said:

"The right of lateral support from adjoining land consists in having the soil in its natural condition remain in its natural position without being caused to fall away by reason of excavations or improvements made on adjacent land. * * * The right to lateral support is said to be a natural one of property, arising from the fact that *in a state of nature* all land is held together and supported by adjacent lands by operation of the forces of nature. Ownership of land is acquired and held subject to the rights and burdens arising from that situation. Supported land has a right of lateral support from that which naturally affords it support. Supporting land is burdened with affording such support to land which it naturally supports. * * *

"As a necessary corollary, it follows that there is no right of lateral support for land where the natural condition thereof has been altered through man's activity so as to create need for lateral support where none existed *in a state of nature,* as where an owner

raises his land above his neighbor's by filling. The right of lateral support 'does not include the support needed because of * * * artificial alterations in the supported land * * *. The measure of this right of the other and of this duty of the actor is the natural dependence of land upon land, and the right and duty are not enlarged by alterations of the natural condition.' Restatement, Torts, § 817c.

"An owner who by filling raises his land above the level of adjoining land has no right of lateral support from the latter and is under the duty to keep soil used in so raising his land off adjoining land." (Italics supplied.)

The Sime case dealt with a situation where one of the parties seeking the support placed the artificial fill on the land himself; whereas, in this case the artificial fill apparently was placed on the land by some predecessor of plaintiff. However, the rules with respect to the right to lateral support are the same in one case as in the other.

There seems to be some question as to what we mean by "the soil in its natural condition." While that question seems to have been resolved in the above case by reference to land "in a state of nature," we think that the authorities clearly show that the right to lateral support exists only when the soil has been undisturbed by act of man. Plaintiff's position that, when fill has become compacted so that it has substantially the same consistency as the soil in a state of nature, she is entitled to support for such fill is untenable. The rule is stated in Restatement, Torts, § 817(1), as follows:

"Except as stated in § 818,[2] a person who withdraws the naturally necessary lateral support of land in another's possession, or support which has been substituted for the naturally necessary support, is liable for a subsidence of such land of the other as was naturally dependent upon the support withdrawn, in the absence of a superseding cause or other reason for relieving him."

---

[2]Not involved here.

In *comment c* we find the following explanation of the rule:

"Naturally necessary lateral support is that support which the supported land itself requires and which in its natural condition and in the natural condition of the surrounding land it would require. It does not include the support needed because of the presence of artificial additions to or other artificial alterations in the supported land or the surrounding land. The measure of this right of the other and of this duty of the actor is the natural dependence of land upon land, and the right and duty are not enlarged by alterations of the natural condition."

*Comment e* reads as follows:

"The rule stated in this Subsection does not apply to additional lateral support required because alterations in the supported land have impaired its cohesiveness and stability. When such artificial conditions exist, this rule applies to only that lateral support which the land itself would require if it were in its natural condition."

Section 840, *comment a*, defines natural condition of the land as follows:

"The term 'natural condition' of land means a condition which is not in any way the result of human activity. The term comprehends soil which has not been cultivated, graded or otherwise disturbed; * * *. The term does not comprehend conditions which would not have arisen but for the effect of human activity even though the conditions immediately resulting from such activity were harmless in themselves and the harmful condition has arisen through the subsequent operation of natural forces."

See, also, § 363, *comment b.*

In 1 Am. Jur., Adjoining Landowners, § 22, we find the following:

"The easement of natural support of the land of one by the land of the adjoining owner applies only to lands in their natural condition, and does not extend so as to give the owner of a building erected on the confines of his land the right to have support for this increased burden resulting in increased lateral pressure. One land-

owner cannot, by altering the natural condition of his land, deprive the adjoining proprietor of the privilege of using his own land as he might have done before; and consequently, he cannot, by building a house near the margin of his land, prevent his neighbor from excavating his own soil, even though it may endanger the house."

See, also, 2 C. J. S., Adjoining Landowners, § 5.

Plaintiff argues that she is entitled to support of the artificial fill for the reason that—

"the instant case comes within Sec. 817 [Restatement, Torts], for the reason that whatever necessary natural support was furnished to Lot 2 by Lot 1 before the fill was put in on Lot 1, was taken away from it when the fill up to the level of Lot 2 was substituted therefor. Respondents concede that there was natural lateral support to the extent of 3 feet before the fill was put in. * * * It wasn't there afterwards because it had no longer any effect on either lot laterally."

Of course, the error in plaintiff's reasoning is that the support which existed in the state of nature has been left undisturbed by defendants. Had there been no fill, there would have been no subsidence. Defendants have left a ledge or terrace sufficient to support the land in its natural condition up to that level. We apprehend that plaintiff has misconstrued § 817. The lateral support for lot 2 in its natural condition before the artificial fill has not been removed. The support which Restatement deals with as a substitute is such support as may be furnished to laterally support land up to its natural level when the original support is removed. It does not mean that, when artificial fill is placed on two lots, one is entitled to the support of such artificial fill from the other. In other words, if defendants had excavated their soil below the natural level of the land, they would be obligated to substitute a retaining wall or some other substitute to support plaintiff's land up to, but not beyond, the natural level of the ground.

We are of the opinion that, under the evidence in this case, there has been no violation of plaintiff's right to lateral support of the land in its natural condition and that, under this doctrine, plaintiff has no rights which have been violated by defendants.

■ Plaintiff next contends that, even if she is not entitled to lateral support under the common-law doctrine of lateral support, she has an implied easement in defendants' land which gives her a right to such support.

The doctrine of implied easement is stated adequately in Roman-chuk v. Plotkin, 215 Minn. 156, 160, 9 N. W. (2d) 421, 424, where we said:

"The doctrine of implied grant of easement is based upon the principle that where, during unity of title, the owner imposes an apparently permanent and obvious servitude on one tenement in favor of another, which at the time of severance of title is in use and is reasonably necessary for the fair enjoyment of the tenement to which such use is beneficial, then, upon a severance of ownership, a grant of the dominant tenement includes by implication the right to continue such use. That right is an easement appurtenant to the estate granted to use the servient estate retained by the owner."

In Restatement, Property, § 476, *comment a*, the rule is stated as follows:

"An easement created by implication arises as an inference of the intention of the parties to a conveyance of land. The inference is drawn from the circumstances under which the conveyance was made rather than from the language of the conveyance. To draw an inference of intention from such circumstances, they must be or must be assumed to be within the knowledge of the parties. The inference drawn represents an attempt to ascribe an intention to parties who had not thought or had not bothered to put the intention into words, or perhaps more often, to parties who actually had formed no intention conscious to themselves. In the latter aspect, the implication approaches in fact, if not in theory, crediting the parties with an intention which they did not have, but which they probably would have had had they actually foreseen what they might have foreseen from information available at the time of the conveyance."

40

The factors determining implication of such easement are stated in § 476 as follows:

"In determining whether the circumstances under which a conveyance of land is made imply an easement, the following factors are important

"(a) whether the claimant is the conveyor or the conveyee,

"(b) the terms of the conveyance,

"(c) the consideration given for it,

"(d) whether the claim is made against a simultaneous conveyee,

"(e) the extent of necessity of the easement to the claimant,

"(f) whether reciprocal benefits result to the conveyor and the conveyee, ·

"(g) the manner in which the land was used prior to its conveyance, and

"(h) the extent to which the manner of prior use was or might have been known to the parties."

In Romanchuk v. Plotkin, 215 Minn. 156, 160, 9 N. W. (2d) 421, 424, we said with respect to the essentials for the creation of an easement by implication:

"It is commonly said that three things are essential to create an easement by implication upon severance of unity of ownership, viz.: (1) a separation of title; (2) the use which gives rise to the easement shall have been so long continued and apparent as to show that it was intended to be permanent; and (3) that the easement is necessary to the beneficial enjoyment of the land granted."

In support thereof, we cited Read v. Webster, 95 Vt. 239, 113 A. 814, 16 A. L. R. 1068, and Berlin v. Robbins, 180 Wash. 176, 38 P. (2d) 1047.

It is not always necessary that the existence of all these essentials be present; they are only aids in determining whether such easement exists. Romanchuk v. Plotkin, supra. Nor are the factors stated exhaustive. Restatement, Property, § 476, comment b. Practically all the authorities do hold, however, that necessity is an essential factor. 28 C. J. S., Easements, § 33; 17 Am. Jur., Easements, § 43;

Annotation, 58 A. L. R. 828. There is much conflict in the authorities, however, as to the proper interpretation of the word "necessary." In Romanchuk v. Plotkin, *supra,* we held that "necessary" does not mean indispensable but that a reasonable necessity is sufficient, following Wiesel v. Smira, 49 R. I. 246, 142 A. 148, 58 A. L. R. 818, and 17 Am. Jur., Easements, § 79.[3]

 Whether an easement may be created by implication must be determined as of the time of severance. McConihe v. Edmonston, 157 Md. 1, 145 A. 215; Pioneer Min. Co. v. Bannack Gold Min. Co. 60 Mont. 254, 198 P. 748; Jones v. Bethel, 20 Ohio App. 442, 152 N. E. 734; Read v. Webster, 95 Vt. 239, 113 A. 814, 16 A. L. R. 1068; 28 C. J. S., Easements, § 31, note 41. A subsequent change of conditions will not defeat an easement, nor can it create one. Godman v. Jones, 180 Ky. 217, 202 S. W. 662. The necessity at the time of the conveyance governs. 17 Am. Jur., Easements, § 43; McElroy v. McLeay, 71 Vt. 396, 45 A. 898; Annotation, 58 A. L. R. 832. The burden of proving necessity rests upon the one claiming the easement. Dolliff v. Boston & Maine R. 68 Me. 173.

The court held in its memorandum that, before an easement can arise by implication, there must be present:

"1: a common title at the time the use or easement is started;

"2: a later separation of the properties;

"3: the use which gives right to the easement must have been so long continued and apparent as to show that it was intended to be permanent;

"4: the easement or use must be necessary to the beneficial enjoyment of the land granted."

The court found that the first three essentials mentioned above were present but not the fourth. It is doubtful, under the court's finding, that it can be said that the fill was placed on the land while it was under a common ownership, but we will assume for the purposes of this decision that the court has so found and that the evidence sustains that finding.

---

[3]See, also, 17 Am. Jur., Easements, § 44.

The evidence in this case is insufficient to establish any necessity for an easement at the time of the severance. The evidence shows, without dispute, that at the time of the severance the part of lot 1 which later developed to be an artificial fill ended abruptly within a few feet of the boundary line. Both lots were vacant and undeveloped at that time. When plaintiff's predecessor decided to build on lot 1 he had several alternatives available to him. He could have graded down the high point of his lot; he could have built his house a few feet farther south so that he would leave enough of his own property to support a driveway; or he could have built his driveway on the south side of his house.

Starrett v. Baudler, 181 Iowa 965, 165 N. W. 216, L. R. A. 1918B, 528, frequently cited in the decisions on this subject, involved an alleged implied easement for support of a building. The court there said (181 Iowa 970, 165 N. W. 217):

"The lateral support to which an adjoining owner is entitled, however, is to the earth or soil in its natural state only, and not to buildings or other improvements which may be placed thereon. If the earth sinks away or falls, in consequence of the increased pressure of a wall or other artificial weight, when, but for such wall or weight, this would not have happened, there can be no recovery; for one so improving his land is bound so to do as not to interfere with his neighbor's right to the full enjoyment of his premises. *In other words, the improvement should have been set back far enough so that the increased requirement for support would have been afforded by his own land."* (Italics supplied.)

Under the circumstances here, it is difficult to see how it can be implied that, at the time of the severance of the two lots, there was any necessity for support of any part of the artificial fill on lot 1 by the fill on lot 2. The fact that such support has become necessary after the severance by virtue of the manner in which lot 1 subsequently was developed cannot give rise to an easement by implication. We are of the opinion that the trial court's determination that the fact of necessity is lacking was proper under these circumstances.

Plaintiff relies mainly on our decision in Romanchuk v. Plotkin, 215 Minn. 156, 9 N. W. (2d) 421. The facts there clearly are distinguishable from those in the case now before us. In that case, a common owner of two dwellings in close proximity to each other connected the plumbing of both to a common sewer. He then lost one of the dwellings by virtue of a mortgage foreclosure. We affirmed the trial court's determination that there was an implied easement to use the common sewer. The distinction is that the necessity for use of the common sewer existed at the time of the severance of the title. In this case no necessity existed when the title to the two lots was severed, but it came into existence only by virtue of the later development of one of the lots.

The record presented on this appeal is hopelessly inadequate, and the briefs come far from furnishing this court with the help it ought to have. The assignments of error also are insufficient to present many of the questions which plaintiff seeks to have us consider. While we might be justified in dismissing the appeal under the rule of Seerup v. Swanson, 223 Minn. 230, 26 N. W. (2d) 33, we have concluded to laboriously examine the typewritten transcript and to dispose of the case on its merits. While we appreciate a genuine effort to abbreviate a record so as to eliminate the necessity of uselessly reading matter not involved in the appeal, an abbreviation which leaves nothing from which we can determine the issues involved is of no help to us.

Affirmed.